792 A.2d 561

IN THE MATTER OF THE ESTATE OF K.J.R., DECEASED.

Superior Court of New Jersey
Appellate Division

Submitted January 29, 2002—Decided March 8, 2002.

Before Judges STERN, LINTNER and PARKER.

*Schubert, Bellwoar, Cahill & Quinn,* attorneys for appellant Bonnie G. (*James M. Tyler,* on the brief).

*Garber, Kasten, Jarve & Mullen,* attorneys for respondent Mildred R. (*Brian T. Reagan,* on the brief).

The opinion of the court was delivered by

STERN, P.J.A.D.

Petitioner, Bonnie G., appeals from a judgment of the Chancery Division, Probate Part, granting the motion of the administratrix of her husband's estate for summary judgment, and dismissing her petition to be substituted as administratrix. The parties appear to agree that such substitution would, in essence, recognize petitioner's intestate share as surviving spouse of Kevin R. Respondent, Mildred R., decedent's mother, was appointed administratrix ad prosequendum after presenting a death certificate indicating that Kevin was divorced at the time of death. She claims that she thought that the divorce proceedings had been finalized by the time of Kevin's death and notes that petitioner executed a renunciation of "any claim ... to Letters of Administration ... and request[ed] they be granted to" respondent. In any event, respondent now asserts that the property settlement agreement ("PSA"), executed by petitioner and Kevin in March of 1991, acted

as a renunciation of all rights petitioner may have had to the estate and its administration.

Petitioner acknowledges that she commenced the action after becoming "aware of her rights, as [Kevin R.'s] widow, to funds available as a result of a nationwide class action lawsuit ..." related to the transfusion of tainted blood affecting Kevin, who was a hemophiliac, diagnosed as being HIV positive before they were married, and infected with the AIDs virus at the time of his death.

Petitioner and Kevin were married in 1987 and separated in early 1991. They executed a PSA on March 1, 1991. Petitioner was represented by counsel at the time. In her answers to interrogatories petitioner indicated that she moved to California, as a result of a transfer by her employer, in November, 1991, and that she spoke to decedent "multiple times on the telephone" from there. She stated that "[d]uring April and May of 1992, [they] spent many hours on the phone discussing [their] situation," and had "an emotional reconciliation" before his death on July 5, 1992.

Petitioner's position was further developed in her depositions. She sought the separation because she "was physically and emotionally completely drained" as decedent became more ill. She testified that "[t]he sicker he became the less he paid[ ] attention to [her] and the more withdrawn he became...." She indicated that she nevertheless continued to take "care of him financially [and] medically," and provided for his health insurance through her employer's coverage. She asked for the PSA because, in the absence of one, she "was terrified ... that Kevin's mother would have him declared incompetent and take power of attorney and make [her] life a living hell," apparently with reference to the marital premises which was titled in her name. The house was ultimately purchased by petitioner's employer upon her relocation to California, and the proceeds were split by her with Kevin.

Petitioner acknowledged that between execution of the PSA in March, 1991 and her move to California in November, there was no endeavor to reconcile. She claimed that the reconciliation

occurred "around the April, May [1992] time frame" when they "talked on the phone a bunch." According to petitioner, "[t]here were about four or five really big conversations" during that period, and they "agreed that [they] loved each other" and "weren't going to get divorced." She admitted "[t]hat from the time . . . that [she was] trying to reconcile with Kevin [in] April or May of '92, up until the time that he passed away, [she] was never . . . in his presence." She was specifically asked what she meant by the term that they "reconciled," and answered "I think it means that you agree to care for the other one . . . and it means that you will—that you'll be there emotionally for them and financially." Finally, petitioner acknowledged that they "never talked about" maintaining or vacating the PSA because it was drafted "for a very specific event . . . for fear of intervention [regarding] the house that was in [her] name." Her complaint for divorce was certified on April 1, 1992 and filed later that month.

Respondent contends that:

At the time of Kevin [R.]'s death in July, 1992 he resided in New Jersey with his girlfriend Ms. Paula [W.]; at this same time Petitioner resided in California, having relocated there in November, 1991; the parties never resumed living together after separation through the date of Kevin's death; at the time of Kevin's death, Petitioner . . . was on a sailing trip with her future (and now current) husband, Ron, where she was intimate with him on that trip; at no point after separation and at no point during any purported reconciliation did she ever resume cohabitation with Kevin.

Paula W. (now Paula G.) certified that Kevin moved in with her after a lease expired and lived with her "until the time of his death." She certified that, although "[d]ue to Kevin's illness [they] did not have a sexual relationship, [they] did sleep in the same bed" and "did everything together." She further certified that "at the time of Kevin's death, we were living together and involved in a boyfriend/girlfriend relationship [and that she] considered Kevin to be [her] best friend and lover," and that "[a]t no time did Kevin ever mention to [her] that he wanted to reconcile with his wife, Bonnie, nor did he express any intention to do so." Respondent also contends that petitioner stopped providing medi-

cal coverage and started a romantic relationship with her present husband while Kevin was still alive.

The appendices on this appeal are not clear in terms of what was before the trial judge on the motion for summary judgment. We are satisfied, nevertheless, that summary judgment was properly granted based on the depositions and interrogatory answers supplied by petitioner.

The petitioner and decedent had entered a counseled PSA, but they were not divorced at the time of Kevin's death. Decedent committed suicide over a year after execution of the PSA and four months after petitioner filed her complaint for divorce. If petitioner prevails, she will be the primary intestate successor of decedent's share of a settlement relating to the tainted blood which contributed to his depressed condition.

The PSA executed by petitioner expressly waived her dower interest, "right to take by intestacy," the spouse's elective share, and "right to act as administrator." *See N.J.S.A.* 3B:8–10 which presumes "waiver of all rights to an elective share ... [and] all benefits which would otherwise pass to him from the other by intestate succession" by virtue of the execution of a PSA. *See also N.J.S.A.* 3B:8–1 (right to "elective share" where surviving spouse and decedent not living apart in different habitation at the time of death, "or had not ceased to cohabit as man and wife"); *Probate of Alleged Will of Hughes,* 244 *N.J.Super.* 322, 327, 582 *A.*2d 818 (App.Div.1990). However, petitioner argues that she and decedent reconciled before his death and that their PSA was voided by the fact of reconciliation. Petitioner also insists that the reconciliation does not require cohabitation.

Petitioner relies on *Brazina v. Brazina,* 233 *N.J.Super.* 145, 558 *A.*2d 69 (Ch.Div.1989). There, the primary question related to whether the marital premises, conveyed to the husband under a PSA, was subject to equitable distribution when the parties separated a second time following a two-year reconciliation. The court held "that, under New Jersey law, the increase in the value of an asset held in the name of one party during a reconciliation is

subject to equitable distribution." *Id.* at 154, 558 *A.*2d 69. In reaching that conclusion, the court first found that a "reconciliation" had, in fact, occurred because the wife and the parties' son moved back into the marital premises with the husband. *Id.* at 150, 558 *A.*2d 69. However, the court said:

> To encourage a reconciliation and the resumption of the marriage it is important that we not impose legal consequences which could discourage the parties from attempting a reconciliation out of fear that an unsuccessful reconciliation effort could result in adverse legal consequences. For these reasons we believe that the preferable rule is to hold that a reconciliation should not be deemed to have occurred until the parties have successfully completed the exploratory stage of a reconciliation and have agreed upon a true and genuine reconciliation, that is to say, when the parties have resolved their major matrimonial differences and agree to permanently resume their former relationship as husband and wife.
>
> . . . .
>
> ... From the few reported cases dealing with this issue the general rule appears to be that a reconciliation does not exist until the parties reside with each other for a sufficient length of time to permit the trier of fact to conclude that the parties resolved their major differences and agreed to permanently resume their marital relationship.
>
> [*Brazina, supra,* at 149–150, 558 A.2d 69.]

Moreover, the *Brazina* court concluded that when "reconciliation," in fact, occurs, "it is the presumed intent of the parties ... to resume the marital relationship in all respects and abrogate any prior agreements restricting or inhibiting the rights of one of the spouses, unless they indicate otherwise at the time of reconciliation." *Id.* at 151, 558 *A.*2d 69.[1] The court added, however, that to protect third parties who entered into a contractual agreement, relying on a PSA which had the effect of creating a legal interest in only one of the spouses, "most courts hold that while the *executory* provisions of a property settlement agreement are abrogated upon a reconciliation, *executed* portions [such as the conveyance in *Brazina*] are unaffected." *Id.* at 151–52, 558 *A.*2d 69. On the other hand, in the absence of a judgment of divorce,

---

[1] The *Brazina* court believed "[t]he primary purpose of the court is to preserve the marriage and, if there has been a separation, to encourage a reconciliation," *id.* at 149, 558 *A.*2d 69. Hence, it appears the *Brazina* court believed these policies would not be promoted by the need for formality in voiding the property settlement agreement.

title searchers and third parties are on notice with respect to a spouse's statutory rights, and the courts can promote reconciliation without the formality of voiding a PSA.

The parties before us differ as to what acts are necessary to constitute "reconciliation" and, upon "reconciliation," whether any formality is necessary to void a counseled PSA. *See generally, "Reconciliation as Affecting Decree for Limited Divorce Separation, Alimony, Separate Maintenance or Spousal Support,"* 36 *A.L.R.*4th 502 (1985); *"Reconciliation as Affecting Separation Agreement or Decree,"* 35 *A.L.R.*2d 707 (1954). We need not address the latter issue, however, because a "reconciliation" cannot be deemed to have occurred in this case. At the most, petitioner and decedent merely spoke by long distance telephone, without any physical contact or face-to-face visits, over the last four or five months of decedent's life, the period during which petitioner claims the reconciliation occurred. During that time, irrespective of whether decedent was living with a partner of the opposite sex and petitioner's relationship with her present husband, petitioner and decedent made no endeavor to reunite physically, much less to void the PSA they executed. *Cf. Probate of Alleged Will of Hughes, supra,* 244 *N.J.Super.* 322, 582 *A.*2d 818 (App.Div.1990) (where husband's visits to wife while terminally ill in hospital, return to her of wedding ring, and decision not to proceed with husband's complaint for divorce after execution of PSA did not permit husband to file caveat to will on grounds of reconciliation).[2] *See also, e.g., Bourne v. Bourne,* 336 *S.C.* 642, 521 *S.E.*2d 519 (Ct.App.1999) (PSA is abrogated as to support obligation upon reconciliation; executed property provisions generally remain unaffected by reconciliation; otherwise PSA controls as to impact of reconciliation); *Smith v. Smith,* 19 *Va.App.* 155, 449 *S.E.*2d 506 (Ct.App.1994) (PSA not abrogated by reconciliation where agreement provides for revocation only by written agree-

---

[2] For the most part, the parties seem to treat the Chancery Division opinion in *Brazina* as binding on us. They would be better served by arguing the statutory and policy reasons which support or prevent its rationale.

ment signed by the parties); *Cooke v. Cooke*, 34 *N.C.App.* 124, 237 *S.E.*2d 323, 325, *cert. denied*, 293 *N.C.* 740, 241 *S.E.*2d 513 (1977) (isolated acts of sexual intercourse not "reconciliation" in absence of intent to resume marriage and repudiate PSA); *Walsh v. Walsh*, 108 *Cal.App.*2d 575, 239 *P.*2d 472, 476 (1 Dist.1952) ("occasional cohabitation does not alone establish a reconciliation;" sexual intercourse without resumption of cohabitation is not sufficient to show the necessary intent to reconcile).

Petitioner has the heavy burden of showing reconciliation sufficient to void a PSA. Whatever proofs may suffice in other circumstances, and assuming that "reconciliation" by itself can suffice to void executory provisions of a PSA (which does not provide otherwise), petitioner has not shown enough to withstand summary judgment on the basis of a factual dispute as to a material fact evidencing "reconciliation" in this case.

The judgment is affirmed.